THOMPSON *v.* CRENSHAW GRAIN COMPANY.

Opinion delivered May 18, 1914.

1.  SALES—BREACH OF WARRANTY—REMEDY.—Where goods delivered to a buyer are inferior in quality to that which was warranted by the vendor, and the buyer accepts the goods and pays the purchase price thereof, he may bring an action for breach of warranty. (Page 173.)

2.  SALES—BREACH OF WARRANTY—TENDER OF PURCHASE PRICE.—Where the buyer of chattels has instituted an action for breach of war-

ranty, the seller can not defeat his right of recovery by offering to receive back the goods and return to him the purchase price. (Page 173.)

3. SALES—BREACH OF WARRANTY—MEASURE OF DAMAGES.—Where the seller of chattels commits a breach of warranty as to kind, quality or condition of the goods sold, the measure of the buyer's injury will be the difference between the value of an article of the kind warranted and the value of the kind actually delivered, and the buyer may recover damages amounting to this difference. (Page 174.)

Appeal from Hempstead Circuit Court; *Jacob M. Carter,* Judge; reversed.

### STATEMENT BY THE COURT.

This is an action by C. S. Thompson against the O. A. Crenshaw Grain Company, brought in the circuit court on the 6th day of February, 1913, to recover damages for an alleged breach of warranty in the sale of a car of corn. The plaintiff filed an affidavit for attachment, in which he stated that the defendant was a nonresident of the State of Arkansas, and caused a garnishment to be issued against the Hope National Bank of Hope, Arkansas. The facts are as follows:

C. S. Thompson, of Hope, Arkansas, wrote to the O. A. Crenshaw Grain Company, a partnership doing business at Charleston, Missouri, for prices on a car of corn, and on the 6th day of January, 1913, received in reply the following letter:

"Your letter of the 5th at hand and noted, we wish to offer you corn in the sack f. o. b. your station today at 62 cts. and we can offer you naked yellow ear corn at 61 cents delivered; this is all good corn, and we try to never use any bad corn if we can prevent it. Hoping these prices will be satisfactory, and we will hear from you in a few days, we remain, yours truly."

Thompson accepted the offer and ordered the corn. The corn was loaded on the car at Belmont, sixteen miles below Charleston, and was received by the Crenshaw Grain Company at Charleston the next day after it was loaded. The car was at once forwarded to Hope. The Crenshaw Grain Company drew on Thompson for the

price of the corn, with the freight added, through the Hope National Bank, of Hope, Arkansas, and attached the draft to the bill of lading. According to the testimony of Thompson, the car reached Hope about four days before the draft and bill of lading, and the draft was paid two days after it came. The draft for the purchase price and freight added amounted to $510.66, and was paid by Thompson on January 25, 1913. Thompson also testified that the corn had been at Hope four days before it was opened; that when the car was opened, the corn was hot and steaming and had sprouts on it from one and a half to two inches long; that the corn was in the same condition all through in spots, and was not fit for use except to feed to hogs. Thompson stopped payment on the draft and telegraphed the Crenshaw Grain Company to come and investigate the condition of the corn, and also told them that the corn was short in quantity. After some telegraphic correspondence between them, the corn was released by the Crenshaw Grain Company, and Thompson paid the draft and took charge of the corn. Other witnesses for Thompson testified that they were experienced grain men, and that they thought it would take about a week or ten days for corn to grow sprouts as long as the sprouts they saw on the corn in question; that when the car was opened they examined the corn, and it was worth not more than twenty-five cents per bushel.

The witnesses for the defendant testified to a state of facts substantially as follows: When the corn was loaded upon the car it was good, dry corn, and had been husked; that the roof of the car leaked to some extent, but not badly. The railroad agent promised that the car should be shipped direct to Hope without a stop, and it left Charleston about the 18th day of January. There was no rotten corn in the car, and none of it had sprouted when shipped from Charleston. That on the 11th day of February, 1913, the defendant offered to take back the car of corn, and tendered to the plaintiff the amount of

the draft, which he had paid. This tender was refused by the plaintiff.

In rebuttal the plaintiff said that an amount of money was tendered him by the agents of the defendant, but that the sum of $510.66 was not tendered him; that he does not know the exact amount of money that was tendered to him because it was not counted out.

The court directed a verdict in favor of the defendant, and the case is here on appeal.

*U. A. Gentry,* for appellant.

1. There appears to be but one controlling question in this case, viz., whether or not appellant had the right to retain the corn in its damaged condition and sue for a breach of the implied warranty. If he did have that right, the court erred in giving the peremptory instruction. As to the implied warranty in a sale of this kind, see 77 Ark. 546; 72 Ark. 343; 48 Ark. 330; Benjamin on Sales, § § 645, 646.

One of the remedies recognized by law, where the goods bought are inferior in quality to that which was warranted by the vendor, is that the purchaser may accept the goods and sue for the breach of the warranty. 2 Benjamin on Sales, 1151, § 1348; 79 Ark. 66; 149 S. W. 52.

2. It appears, therefore, that appellant had the right to retain the corn and to bring action for the breach of warranty, hence the question of tender does not properly belong in the case; but, in any event, the alleged tender was not made until after suit was brought, and did not include the costs accrued to date. 72 Ark. 213; 38 Cyc. 138, and cases cited in note 41.

*Steve Carrigan, Jr.,* for appellee.

1. When upon consideration of the entire evidence in a case, it appears that reasonable minds could reach but one conclusion therefrom, it becomes a question of law, and it is proper for the court to direct the verdict. 89 Ark. 534; 116 S. W. 106; 112 S. W. 910; 163 S. W. 149.

2. It was not necessary to tender the accrued cost. Had the tender been accepted when made, the court, as. a matter of right, could have adjudged the cost against appellee. Payment of the debt sued for, during pendency of the suit, will not bar a judgment against the defendant for cost. 28 Ark. 461.

HART, J., (after stating the facts). Counsel for appellant seeks to reverse the judgment on the ground that the court erred in directing a verdict in favor of defendant; and in this connection we think he is correct. At the time the plaintiff purchased the car of corn involved in this suit, he had no opportunity to inspect the same, and there was an implied warranty on the part of the seller that the corn was reasonably fit for use. *Truschel* v. *Dean,* 77 Ark. 546; *Bunch* v. *Weil,* 72 Ark. 343. According to the testimony of the plaintiff, the corn had sprouted and was rotten and unfit for use. The plaintiff paid for the corn and received it. Where the goods delivered to the buyer are inferior in quality to that which was warranted by the vendor, and the buyer accepts the goods and pays the purchase price thereof, he may bring an action for breach of warranty. Benjamin on Sales, (7 ed.), § 893; Mechem on Sales, Vol. 2, § § 1807-1809-1810; *Yellow Jacket Mining Company* v. *Tegarden,* 104 Ark. 573; *Warden* v. *Middleton,* 110 Ark. 215, 161 S. W. (Ark.) 151. It is true the defendants adduced evidence tending to show that they offered to take back the car of corn and to pay back to the plaintiff the amount he had paid for the same. This offer, however, was not made until February 11, 1913. The present suit was instituted on February 6, 1913. Thus, it will be seen that plaintiff instituted the action before the tender was made to him. He exercised his option to receive the goods and pay for them and sue the defendant for a breach of warranty. After he had done this the defendants could not defeat his right of recovery by offering to receive back the goods and return him the purchase money.

For the benefit of the parties on a retrial of the case, we will determine the question of the measure of dam-

ages. Mr. Mechem says: ''Where the article furnished by the seller is not such in kind, quality or condition as it was expressly or impliedly warranted to be, the direct and natural loss to the buyer who keeps it is obviously the difference between the value of an article of the kind he was thus entitled to receive and the value of the article which he has in fact received. For this loss he is entitled to compensation. There may, of course, be other losses resulting from the seller's default, and these will be considered later; but the direct and immediate loss will be at least this difference in value. For the breach of warranty, then, as to kind, quality or condition, the measure of the buyer's injury will be the difference between the value of an article of the kind warranted and the value of the kind actually delivered; and for this difference the buyer may recover damages.'' Mechem on Sales, Vol. 2, § 1817.

For the error in directing a verdict in favor of the defendant, the judgment will be reversed and the cause remanded for a new trial.